1

```
 1          UNITED STATES DISTRICT COURT
            SOUTHERN DISTRICT OF FLORIDA
 2             CASE NO:15-23129-CIV-DPG
    _____
 3

 4  ROBERTO ALVAREZ
    and all others similarly
 5  situated under 29 USC 216 (B),

 6
                        Plaintiff,
 7
                   -vs-
 8
    LOCURA MARINA, INC.
 9  JOSE VALERA
    DEBRA BARRIENTOS
10

11                      Defendants.
    _____\
12

13

14  AT:        300 71 Street
               Suite 605
15             Miami Beach, Florida 33141
               January 11, 2016
16             2:30 P.M.

17

18          DEPOSITION OF DEBRA BARRIENTOS

19

20          Taken before Rochel Albert, CSR and Notary

21  Public in and for the State of Florida at Large,

22  pursuant to Notice of Taking Deposition filed in the

23  above cause.

24

25   DEPO EXPRESS REPORTING, INC. (305) 305-3333
```

2

```
 1    APPEARANCES:

 2         DAVID KELLY, Esq.
           LAW OFFICES OF J.H. ZIDELL
 3         300 71st Street, Suite 605
           Miami Beach, Florida  33141
 4         Attorney for Plaintiff

 5

 6         GARY A. COSTALES, Esq.
           GARY A. COSTALES, P.A.
 7         1200 Brickell Avenue, suite 1230
           Miami, Florida  33131
 8         Attorney for Defendant

 9

10    Also present:  CONSUELO BURRANCA, interpreter

11                   I N D E X

12    WITNESS              EXAMINATION  BY        PAGE

13    DEBRA BARRIENTOS        Mr. Kelly  ......  3, 42
                              Mr. Costales .........42
14
      EXHIBITS FOR IDENTIFICATION            PAGE
15

16    A - Records                            36

17    B - Tax record                          6

18

19

20

21

22

23

24

25
```

```
 1                    CONSUELO BURRANCA,
 2               interpreter, was sworn in to
 3               translate from English to Spanish
 4               and Spanish to English to the best of
 5               her ability.
 6                    DEBRA BARRIENTOS,
 7               being first duly sworn by the court
 8               reporter, testified as follows:
 9                       EXAMINATION
10  BY MR. KELLY:
11       Q    Good afternoon.
12       A    Good afternoon.
13       Q    My name is David Kelly.  I represent the
14  plaintiff, Mr. Alvarez.
15            For the record, would you please state
16  your full name?
17       A    Debra Barrientos.
18            MR. KELLY:  And before we get started, I
19  just wanted to clarify the scope of this
20  deposition.  First of all, my understanding is
21  that Ms. Barrientos is going to be the corporate
22  representative, as well as the individual in this
23  case?
24            MR. COSTALES:  Yes.
25       A    Yes.
```

```
1              MR. KELLY:  Second of all, my
2     understanding is that the defendants are
3     stipulating to FLSA coverage for 2015.  So I don't
4     need to go into any interstate commerce or gross
5     annual income questions as to coverage for 2015?
6              MR. COSTALES:  Yes.
7              MR. KELLY:  As to 2014, regarding the
8     issue enterprise coverage, my understanding is
9     that the defendants do not stipulate to the gross
10    annual income for 2014?
11             MR. COSTALES:  Correct.
12             MR. KELLY:  But do not contest the
13    interstate commerce part of enterprise coverage
14    for 2014, for that year?
15             MR. COSTALES:  That is not correct
16    exactly.  We don't dispute that the restaurant
17    uses goods and materials that come from outside
18    the state of Florida.  But we dispute the $500,000
19    gross revenues for 2014.
20             MR. KELLY:  But I understand that to mean
21    that if by chance the $500,000 was established for
22    some reason, then there would be enterprise
23    coverage?
24             MR. COSTALES:  Yes.
25             MR. KELLY:  Okay.  Lastly, my
```

1    understanding is the defendants agree that both

2    Jose Valera and Debra Barrientos were the

3    individual FLSA employers of the individual, along

4    with the corporation?

5            MR. COSTALES:  Yes.

6            MR. KELLY:  So we won't ask any questions

7    regarding operational or control-related issues.

8        Q    Ms. Barrientos, do you know who the

9    plaintiff, Roberto Alvarez, is?

10       A    Yes.

11       Q    Did he work for your company, Locura

12   Marina?

13       A    That's correct.

14       Q    And what is the address where the

15   plaintiff worked for you?

16       A    7118 Collins Avenue, Miami Beach.

17       Q    Is that the only location where Mr.

18   Alvarez worked for you?

19       A    That's correct.

20       Q    Is it accurate that he started working for

21   your restaurant in May -- the beginning of

22   May 2014?

23       A    Correct.

24       Q    And then he continued working there until

25   about August 11th, 2015?

1     A     That's right.

2     Q     And what was his job when he worked there?

3     A     He was a waiter.

4     Q     Is that the only job that he ever did

5     during that period?

6     A     That's correct.

7     Q     For the year 2014 -- I am just going to

8     give your attorney produced tax returns.  I am

9     going to give you the first page.  I have it

10    marked as Exhibit B.

11                (Plaintiff's Exhibit Number

12         B was marked by the court reporter and is

13         attached to the end of the transcript.)

14    Q     Are you familiar with this first page of

15    your 2014 tax returns for Locura Marina?

16    A     That's correct.

17    Q     Do you see there on line 1-C, it has the

18    total $144,410.

19    A     Uh-huh.

20    Q     And just for the record, if you can say

21    "yes" or "no" so it's clear.

22    A     Okay.  Sorry.

23         Yes.

24    Q     And in 2014, when did the restaurant start

25    doing business on Collins Avenue?

7

```
 1      A    May 1st.
 2      Q    Just to be clear, is it your testimony
 3   from May 1st until the end of 2014, this amount
 4   for the gross sales of $144,410, that is the
 5   accurate total amount for that location?
 6      A    Yes.
 7      Q    During that period of time in 2014, how
 8   many employees did the Collins location have?
 9      A    Approximately, from five to six.
10      Q    And who were those employees?  Do you know
11   the names?
12      A    We have Mrs. Maria Arsi, Cesar
13   Compodonoco, John Espejo, Roberto Alvarez, Pedro
14   Ordones.
15      Q    Does Pedro still work at the company?
16      A    Yes.
17      Q    What is his position there?
18      A    In the kitchen.
19      Q    What about Jesus Alvarez?  Is he still
20   there?
21      A    Yes.
22           But he comes later on.
23      Q    What is his job?
24      A    He is a waiter.
25      Q    What is Cesar's job?
```

```
1      A     Waiter.

2      Q     And Maria Arsi?  What is her position?

3      A     Waiter, waitress.

4      Q     Just to be clear, we have Maria, Cesar,

5   Jesus, Pedro.  Anybody else?

6      A     John Espejo.

7      Q     How do you spell last name?

8      A     E-S-P-E-J-O.

9      Q     And what is his job?

10      A     Kitchen.

11      Q     Since May of 2014, have you had any other

12   employees other than them and the plaintiff?

13      A     After 2015, I don't remember when exactly,

14   but we have had Antonio.  I don't remember the

15   last name.

16      Q     Is he gone?

17      A     He left.

18      Q     Anybody else that you can remember?

19      A     No.

20      Q     Do you know someone named Ernesto Garis?

21      A     Yes.

22      Q     Who is Ernesto Garis?

23      A     He was a worker, a waiter.

24      Q     And he is gone now?

25      A     Yes.  He lasted very little.
```

```
 1      Q    Do you know someone named Camilla?

 2      A    Yes, two.

 3           It was a busboy.

 4      Q    Is Camilla a man?

 5      A    No.  It's a woman, Camilla.

 6      Q    Do you know Camilla's last name?

 7      A    No.

 8      Q    What was her job again?

 9      A    She would serve out the water.  She was

10    like a busboy.

11      Q    When I see here on the tax returns

12    Mr. Palacios, is Mr. Palacios, he is the one who

13    prepared this tax return?

14      A    That's correct.

15      Q    What is Mr. Palacios' relationship to your

16    company?

17      A    He is the accountant.

18      Q    In 2014, did you -- the other defendant,

19    Jose Valera, is that your husband?

20      A    Yes.

21      Q    Let's say since 2014, did you and

22    Mr. Valera have ownership in any other companies?

23           MR. COSTALES:  Objection to form.

24      A    Yes.

25      Q    When Mr. Palacios prepared these tax
```

1    returns for 2014, did he take into consideration

2    the cash money that the restaurant on Collins

3    received?

4         MR. COSTALES:  Object to form.

5    A    Excuse me?

6    Q    Some of your customers pay by credit card

7    or debit card; is that correct?

8    A    Correct.

9    Q    And some of them pay with cash?

10   A    Very few.

11   Q    With respect to your 2014 tax returns, did

12   Mr. Palacios factor in all the cash as well when

13   he came to that total of $144,410?

14        MR. COSTALES:  Objection to form.

15   Q    You can answer, if you understand.

16   A    What happens is, there wasn't very much

17   cash, and the little that came in was what we were

18   able to tell Palacios about.

19   Q    How did you tell Palacios about it?  Did

20   you keep track of it on a ledger or some other

21   area to give him?

22        MR. COSTALES:  Object to the form.

23   A    I believe I made a list.

24   Q    So you believe that Mr. Palacios -- any

25   cash that the restaurant did receive, Mr. Palacios

```
 1    included it on line 1-C of this tax return; is

 2    that correct?

 3        A    He was the one that prepared for --

 4        Q    I would need to ask him to be sure?

 5             MR. COSTALES:  Objection to form.

 6        A    I expect so.

 7        Q    What is the name of the other company that

 8    you and your husband -- do you own another

 9    company?

10        A    My husband and I have other companies in

11    New Jersey.

12        Q    Are they restaurants?

13        A    Yes.

14        Q    What are the names of those other

15    companies?

16        A    Parrillatas Dany.

17        Q    How do you spell that?  P-A-R?

18        A    P-A-R-R-I-L-L-A-T-A-S, Dany, D-A-N-Y.

19        Q    Could you tell me the first word,

20    Parrillatas, how is that spelled?

21        A    Parrillatas is P-A-R-R-I-L-L-A-T-A-S,

22    Dany, with one "N."

23        Q    And what is that company?

24        A    It's a meat restaurant.

25        Q    What is the corporation's name?  Is it
```

1     Parrillatas Dany, Incorporated or something else?

2        A     Parrillatas Dany, INC.

3        Q     And where is this located?

4              MR. COSTALES:  Objection to form.

5        A     In New Jersey.

6        Q     Do you know what city?

7        A     Union City.

8        Q     Do you know the address?

9        A     112 48th Street.

10       Q     Is that 112?

11       A     Uh-huh.

12       Q     112 48th Street?

13       A     Correct.

14       Q     Is that restaurant still there?

15       A     Yes.

16       Q     Has it been there since 2013?

17       A     Yes.

18       Q     Did Mr. Palacios do the taxes for that

19    company?

20       A     Yes.

21       Q     We have here in 2014, the line 1-C we are

22    looking at.  For 2013, do you know how much the

23    line C, 1-C, was for Parrillatas Dany in 2013?

24              MR. COSTALES:  Object to form.

25       A     No.

13

```
 1      Q    Do you know if it was more than -- can you

 2   tell me was it more than 300,000?

 3      A    No.

 4      Q    Do you think it was less?

 5      A    I don't know.

 6      Q    What about 2014?

 7           MR. COSTALES:  Objection to form.

 8      A    I don't know.

 9      Q    Do you know if any year it was more than

10   500,000?

11      A    I don't remember.

12      Q    Who owns this company?  You and your

13   husband?

14      A    My husband.

15      Q    Do you own it, too?

16      A    In the business of the Bariados business,

17   it's only my husband's name that appears.

18      Q    But both of you own Locura Marina on

19   Collins, right?

20      A    That's correct.

21      Q    Are there any other businesses that you

22   and/or your husband own?

23      A    I don't know.

24      Q    Have you owned any other business since

25   2013?
```

14

1       A       No.   Just the ones mentioned.

2       Q       Does that company in New Jersey or that

3    restaurant, does it use the name also Locura

4    Marina?

5       A       That's correct.

6       Q       It's doing business as Locura Marina?

7       A       Correct.

8       Q       Just to be clear, does Mr. Palacios do the

9    taxes for that company as well?

10      A       That's correct.

11      Q       In 2014, did Locura Marina here on Collins

12   and the Locura in New Jersey, did they ever share

13   any bank accounts?

14      A       No.

15      Q       Did either the New Jersey company or the

16   company here, did either one ever loan each other

17   money, finances?

18      A       No.

19      Q       Just to be clear, when you opened up the

20   Locura Marina on Collins here, did any of the

21   money from the New Jersey -- did you use any of

22   the money from the New Jersey restaurant or bank

23   account to help finance the restaurant here?

24              MR. COSTALES:   Object to form.

25      A       No.

1    Q    Mr. Palacios does the taxes for both the

2  New Jersey company and this company here, right?

3    A    That's correct.

4    Q    Have the two companies ever had employees

5  that went from one company to the other?

6    A    No.

7    Q    Did the restaurant here and the restaurant

8  in New Jersey ever share any equipment?

9    A    No.

10    Q    Did they ever share any supplies, any food

11  supplies?

12    A    No.

13    Q    Are the menus the same or different?

14    A    Different.

15    Q    Is there anything the same or are they

16  completely different?

17         MR. COSTALES:  Objection to form.

18    A    What are we calling the same?  A dish

19  called lomo sentado, that is sold in all the

20  restaurants in Peru or in Ecuador.  What are we

21  calling that?

22    Q    There are some similar meals on the menu;

23  is that correct?

24         MR. COSTALES:  Objection to form.

25    A    That's obvious.

16

```
 1      Q    Does the restaurant here and the

 2   restaurant in New Jersey use any of the same

 3   suppliers?

 4      A    No.

 5      Q    So you buy, for example, all your meats

 6   and food supplies -- the two restaurants buy them

 7   from completely different suppliers?

 8      A    Of course.

 9      Q    Do you know whether the plaintiff, Mr.

10   Alvarez, did he ever have to make any phone calls

11   to the New Jersey restaurant for any reason?

12      A    I don't remember.

13      Q    Is there any -- do any of your employees

14   here in the Collins restaurant ever need to

15   contact anybody up in the New Jersey restaurant

16   for any reasons?

17           MR. COSTALES:  Objection to form.

18      A    I don't remember.

19      Q    Does the restaurant here in Collins Avenue

20   order the supplies from a supplier outside -- that

21   is located outside of Florida?

22      A    I remember one simple time, that one New

23   Jersey supplier sent me this product, which is

24   blood sausage.  That is it.  Only once.

25      Q    Your food supplier is in Florida normally?
```

1     A    That's correct.

2     Q    And the New Jersey restaurant's suppliers

3   are in New Jersey?

4     A    Correct.

5     Q    When you opened this restaurant down here,

6   did you use anything from the New Jersey

7   restaurant, any of the equipment or anything,

8   tables, menus, anything, to help open up this

9   restaurant location on Collins?

10    A    No.

11    Q    Now the plaintiff is saying that on or

12   about August 10th 2015, that he had asked you or

13   talked to you about allegedly being owed overtime

14   or minimum wages.  Do you remember that?

15    A    No.

16    Q    Prior to the filing of this lawsuit, did

17   the plaintiff ever -- well, let me ask you this.

18         Before he left the company, at any time

19   did the plaintiff ever talk to you about the issue

20   of minimum wages or overtime wages?

21    A    No.

22    Q    Do you agree that on August 11th, 2015,

23   that the plaintiff -- he was fired on that day by

24   you?

25    A    Yes.

1      Q     And why was he fired?

2      A     Because for about the period of 15 days,

3    it was something that involved him and the other

4    employees.  The other employees had noticed that

5    the tips left in cash money by customers, he would

6    take them all for himself.

7      Q     Do you believe the plaintiff was stealing

8    cash tips?  Is that what you are saying?

9      A     The employees noticed that situation, and

10   they let me know about it.

11     Q     Which employees told you that?

12     A     Jesus Alvarez and Cesar Compodonoco.

13     Q     When did they first tell you about this?

14     A     About 15 days prior to him being fired.

15     Q     Is Jesus Alvarez related to the plaintiff

16   at all, if you know?

17     A     No.

18     Q     Did you believe Jesus and Cesar that the

19   plaintiff was stealing the cash tips?

20     A     Before believing them, we did some sort of

21   follow-up, whereby I communicated to my employees

22   that the extra tips had to be added, and that at

23   the end of the closing and for them to tally that

24   up to come up with the same amount or an amount

25   similar to what had been added.

1          They found out that there were always 20-

2    to $25 less.

3      Q    How did they know that the plaintiff was

4    the one responsible for that?

5      A    Because Mr. Alvarez would many times leave

6    the restaurant.  He had an account at Bank of

7    America.  We were right next to it.  We did not

8    know what he was going to do.

9          So we guessed that he went to keep it

10   there, so there would be no evidence in his

11   person.  He wouldn't have any evidence.

12     Q    How many days before the plaintiff was

13   fired was he suspected of doing this?

14     A    They let me know about this about 15 days

15   before.  I do not know how long it was when they

16   were -- they were suspicious of this.

17     Q    When you fired the plaintiff, what did you

18   tell him?

19     A    At the beginning, he told me, don't fire

20   me.  If you want, I will not touch the cash

21   register anymore.

22     Q    So he denied that he stole -- did he deny

23   that he stole the tips or did he admit it?

24     A    He did not deny it for a minute.  I

25   reached the conclusion.

20

```
 1          I do not touch the cash register, and then

 2    I will not be blamed for it anymore.

 3    Q     What did you tell him regarding that?

 4    A     I said no.  I said, I really have this big

 5    mistrust about what you have been doing.

 6          Him seeing that I was upset, that I was

 7    not doing what he wanted me to do for him, he told

 8    me pay me for the day that you owe me.  I

 9    immediately paid him.  And I said, I am sorry, you

10    were the one that lost.

11          One of the cooks was present there and he

12    heard how he insulted me.

13    Q     How did he insult you?

14    A     He started screaming, this is not going to

15    end up like this.  And excuse me for the word to

16    be said.  He said, you crappy old woman, shitty

17    old woman, you are going to see the shit.  I

18    remained quiet.  I kept on looking at him.

19          He left.  He just shut the door of the

20    back of the restaurant.  He shut it with a big

21    blow.

22    Q     He left?

23    A     And he left.

24    Q     And who was present that heard this?

25    A     Now I am going to mention a new employee
```

```
 1    that I did not mention him before, because you

 2    were asking me about the employees for 2014.  But

 3    this is a new employee.  He is a cook and his name

 4    is Edwin Cano.

 5        Q    How do you spell his last name?

 6        A    C-A-N-O.

 7        Q    Cano?

 8        A    Cano.

 9        Q    Edward or Eduardo?

10        A    Edwin.

11        Q    Edwin Cano.  Okay.

12             He is a cook?

13        A    Uh-huh.

14        Q    He is still there?

15        A    That's correct.

16        Q    And he was present when this -- when the

17    plaintiff was fired?

18        A    The first conversation was between Alvarez

19    and myself.  It was me and him.  After ten

20    minutes, after that exchange of words took place,

21    that was when Edwin came into work.  So he ended

22    up listening to the ugliest part of the story.

23        Q    Did anybody else hear any of the

24    conversation from when the plaintiff was fired

25    until he left?
```

```
 1            MR. COSTALES:  Objection to form.

 2      A    No.

 3      Q    Did you talk to your husband, Mr. Valera,

 4 about firing the plaintiff?

 5      A    Yes.

 6      Q    And was the decision to fire the plaintiff

 7 a joint decision between both you and Mr. Valera?

 8      A    That's correct.

 9      Q    Where was Mr. Valera when the plaintiff

10 was being fired?

11      A    In Peru.

12           (A break was taken.)

13      Q    Now, the plaintiff, one of his claims, he

14 said that during his employment that your

15 restaurant began retaining or keeping

16 approximately $150 from his tips, and he said that

17 he was told that such money that was being

18 withheld was for Social Security withholdings and

19 Medicaid, but that you failed to take any of that

20 money and pay it to the IRS.

21      A    That is a lie.  That is a lie.

22      Q    Did you withhold taxes from the

23 plaintiff's pay?

24      A    From tips?

25      Q    Did you withhold taxes at all?
```

1     A    No, no.  Can I explain?

2     Q    Please.

3     A    May 1st, I started working.  All the tips

4    from credit cards, I would give that immediately

5    to the employees of that shift.  As the year went

6    by, almost at the beginning of 2015, I find out

7    that on giving the tip fully, that is the tip from

8    credit cards, they had never paid the taxes that I

9    pay monthly to the State here in Miami.  Because

10    the taxes that I pay monthly, which are the

11    nine percent, seven percent is for taxes, and

12    two percent go to Miami Beach.

13         There's an amount in the system that the

14    previous owner left, which was 3.33 percent, that

15    the previous owners would take from the employees

16    so that they were able to give the part that would

17    give to them for tips.

18         So from the day that problem was found

19    out, the three employees or the two employees of

20    the shift when the sale was already done per

21    shift, they would leave the percentage.  If it was

22    $100, they would leave $1.60.  According to the

23    percentages, that was what they would leave.  Not

24    him only, but all of them.  Up to now, all

25    employees would leave in an envelope every day

1    what they have to pay from the tips that one gives

2    them.

3        Q    This company that was there before when

4    you started the restaurant here, was that other

5    restaurant already closed down?

6        A    No.

7        Q    You just took over the business; is that

8    how it worked?

9        A    Yes.  It was handed over to me on

10   April 30th, and I started on May 1st.

11       Q    Was the plaintiff already working there,

12   Mr. Alvarez?

13       A    He was a busboy.

14       Q    What was the name of that other company?

15       A    Mistura.

16       Q    Do you know who owned Mistura?

17       A    Nestor Rojas.

18       Q    Do you know where Nestor Rojas lives now,

19   what his address is?

20       A    I do not have the address, nor his phone

21   number.  But if it is necessary, I can find it out

22   through an accountant that I have for the

23   business.

24       Q    Mr. Palacios?

25       A    No.  That would be Nestor Rojas'

1    accountant.

2         Q    Did you ever have any ownership in Mistura

3    at all?

4         A    Never.

5         Q    Did your husband?

6         A    No.

7         Q    How did you meet Mr. Rojas?

8         A    Because my husband and I, on March 18th,

9    we came on vacation here.  We were going by

10   Collins because we were staying in Hallandale.  We

11   saw that the restaurant had been transformed.  We

12   went there as part of the public to buy food, and

13   my husband asked one of the waiters whether the

14   restaurant was being sold, whether the restaurant

15   was for sale.  And the following day we returned,

16   and Mr. Rojas was already there waiting for us,

17   waiting to talk to us.

18        Q    So you bought the restaurant from

19   Mr. Rojas?

20        A    That's correct.

21        Q    How much did you buy the restaurant for?

22             MR. COSTALES:  Object to the form.

23        A    How much that we bought it for?  100,000,

24   I don't remember.  100,000.

25             I have the documents there if it is

26

1    necessary.

2       Q    When you took the restaurant over, did you

3    continue to pay the plaintiff the same amount that

4    he was paying in Mistura?

5       A    I believe it was a little more.

6       Q    Did you ever withhold any of the

7    plaintiff's tips, though?

8            MR. COSTALES:  Object to the form.

9       A    Not ever.

10      Q    Did you ever withhold an amount in the

11   amount of about $150 from the plaintiff's pay in

12   any way?

13           MR. COSTALES:  Object to form.

14      A    Never.

15      Q    Did the plaintiff ever complain to you

16   about minimum wages or overtime?

17      A    Never.

18           MR. COSTALES:  Object to form.

19      Q    Did he ever complain to you about amounts

20   of money that were being withheld from his check?

21      A    I never withheld anything.

22      Q    But you did at some point withhold a

23   percentage?

24      A    One dollar.

25      Q    One dollar, for what?

1      A     Per employee for the amount of tips that

2    one would hand over to them.

3      Q     When you say one dollar, what do you mean

4    by one dollar?

5      A     If the tip was $93, to be distributed by

6    2.5 points, and you multiply 93 times 3.33, it is

7    $2.60, per day.

8      Q     And you were doing that for tax

9    withholding purposes?

10     A     To be able to return that to Miami Beach

11   for the taxes.

12     Q     Just to be clear, why was the plaintiff

13   paying Miami Beach taxes?

14     A     No, no.  He doesn't pay the taxes to Miami

15   Beach.

16     Q     But you would take a percentage out of the

17   plaintiff's tips to pay for the Miami Beach taxes?

18     A     No.

19           For out of the nine percent that one

20   charges the customer, the customer puts the tax in

21   the credit card.  From that tip, all of them have

22   to give the percentage that corresponds to them.

23   All of them, not only him.  All of them.

24     Q     But it comes out of their tips, though,

25   the waiters' tips?

28

```
1      A    That is obvious.

2      Q    And the tips are used to pay the Miami

3   Beach tax; is that right?

4      A    No.

5      Q    What is it used for?

6      A    To pay not only Miami Beach, but all the

7   taxes that have to be returned per month, right?

8      Q    You mean the federal taxes?

9      A    Yes, sir.

10     Q    When you say Miami Beach, is that a local

11  tax?

12     A    Of course.

13     Q    Did you ever charge your customers a

14  service charge?

15     A    No.

16     Q    When the customers would eat there, they

17  would pay for the food and they would pay for the

18  sales tax, and they could leave a tip voluntarily

19  if they wanted to; is that correct?

20     A    No.  The tip is included.

21     Q    Automatically?

22     A    Yes.

23     Q    And how much was the tip?

24     A    Nineteen percent.

25     Q    How much?
```

1       A    Eighteen percent.

2       Q    Was it always 18 percent since the

3    plaintiff started working for your company?

4       A    That is how the prior owners did, and the

5    waiters explained it to me that way.

6       Q    When the customer would use a credit card,

7    you would give the plaintiff his tips directly at

8    the end of the night, or how would that work?

9       A    Yes.  What they added, what was seen on

10   the screen immediately, I would give it in cash

11   every day, even if it came out from my own purse.

12      Q    If the customer left cash tip, they would

13   just keep the tip?

14      A    That was their responsibility.

15      Q    Did any of the waiters at any time ever

16   have to do a tip pool, like put all their tips

17   together and split them?

18      A    Correct.

19      Q    During the entire time the plaintiff

20   worked there, from May of 2014 until when he was

21   fired, is that always how it worked?

22      A    Always.

23      Q    And the waiters always shared equally?

24   All the waiters shared one tip pool equally?

25      A    Correct.

1     Q     How much was the plaintiff when he first

2     started working in May 2014, how much was he paid

3     per hour?

4     A     Thirty-five dollars for six hours.

5     Q     Was that always his rate of pay?

6     A     Correct.

7     Q     Did the busboys get a percentage of the

8     waiters' tip pool?

9     A     Yes.

10    Q     Did they get a percentage or how did it

11    work?

12    A     The waiters get one point and the busboys,

13    0.5.

14    Q     When you say 0.5 --

15    A     That is half of one.

16    Q     Like 50 percent?

17    A     Yes.

18    Q     In the end, the busboys got about half

19    what the waiters got in tips?

20    A     That's correct.

21    Q     Did any managers or supervisors ever share

22    in the tip pool?

23    A     No.

24    Q     With the percentage -- before you talked

25    about taking the percentage from Miami Beach, did

1    that come directly from the tips?

2        A    No.

3        Q    The money that went -- where did that

4    percentage come from?  Was it -- to the Miami

5    Beach.

6        A    From the taxes that customers are charged.

7        Q    The Miami Beach -- the customer was

8    charged, the customer?

9        A    Sorry.  There's a confusion here.

10            The taxes, the nine percent that are

11   charged, those go for sales taxes and the resort

12   taxes that go to Miami Beach, right.  The

13   3.33 percent that is charged to waiters, the

14   3.33 percent is the discount.  That is made

15   because that is what the credit card companies

16   charge us to charge their tips.  I had been

17   confused about this.

18       Q    The 3.33 percent was taken from the tips

19   to pay for the credit card charges?

20       A    Only when it was the tip for the credit

21   cards.  Never for the cash.

22       Q    Was it always like that the entire time

23   the plaintiff worked there?

24       A    No.  That started almost at the beginning

25   of 2015.

1       Q       Why didn't you do that before then?

2       A       Because I had not taken into account,

3   because I had not thought about that part.

4       Q       You implemented that in early 2015?

5       A       Until now.

6       Q       Did you ever check with anybody to

7   determine if that was legal or that was something

8   that you were allowed to do?

9       A       The prior owner left in the system that

10  method already.

11      Q       Did the plaintiff, when he worked, did he

12  have a supervisor?

13      A       No.

14      Q       For the past five years, have you known,

15  yourself, have you known what overtime and minimum

16  wages are?

17              MR. COSTALES:  Object to form.

18      A       I don't know.

19      Q       Do you know what minimum wages are?

20      A       Of course.

21      Q       Have you known about that over the past

22  five years, like what that is?

23      A       I know what a minimum wage is.

24      Q       And then overtime, time and a half pay, do

25  you know what that is?

```
 1           MR. COSTALES:  Object to the form.

 2      A    Yes.

 3      Q    My question is, have you known about

 4 overtime and minimum wage for at least the past

 5 five years?

 6           MR. COSTALES:  Object to the form.

 7      A    Yes.

 8      Q    Prior to this lawsuit, were you or your

 9 husband or any of your businesses ever involved in

10 a lawsuit, different lawsuit, that involved

11 allegations regarding minimum wages or overtime

12 allegations?

13      A    No.

14      Q    Prior to this lawsuit, did either you or

15 your husband or anybody else at the restaurant

16 ever contact anybody outside the company to

17 determine if you were paying the waiters like the

18 plaintiff in accordance with the overtime and

19 minimum wage laws?

20      A    No.

21      Q    At the location where the plaintiff worked

22 on Collins, when the plaintiff worked there, were

23 there any posters hanging up there that made

24 reference to tips or something called a tip

25 credit?
```

1      A     No.

2      Q     Did you ever tell the plaintiff or did

3   anybody ever explain to the plaintiff that his

4   hourly wages were going to be somehow credited by

5   the tips he received?

6      A     I guess they knew that.

7      Q     Did anybody -- do you recall whether you

8   or your husband or anybody actually explained that

9   to the plaintiff?

10     A     No.

11     Q     Did the plaintiff have a particular

12  schedule that he normally worked?

13     A     Yes.

14     Q     And at the beginning, in May of 2014, what

15  was his schedule?

16     A     Monday through Friday from 10:30 to 5:00

17  p.m.

18     Q     10:30 in the morning?

19     A     Yes.

20     Q     And that was five days a week?

21     A     On Saturdays, from 5:00 to 11:00 p.m.

22     Q     Did he ever work Sundays?

23     A     From all the time that he worked, if he

24  did a double shift, perhaps if you counted that,

25  he could have worked ten times a year.

1     Q     You think he only worked a double shift

2   maybe ten times each year?

3     A     Yes.

4     Q     What was the other shift?  If he worked a

5   double shift, what was that?  What were those

6   hours?

7     A     It would be from 10:30 to 10:30.  If there

8   was a problem with the waitress, that she had a

9   sick child, then we would ask him as a favor, and

10   he would say okay and he would stay.

11     Q     Just so I am clear, is the company, the

12   restaurant, open Sundays?

13     A     Yes.

14     Q     Did the plaintiff ever work Sundays?

15     A     Almost never, no.  No, he never worked on

16   Sundays.

17     Q     Did the plaintiff, on his shifts, did he

18   get a break period, like a specific amount of time

19   for lunch or some other break?

20     A     Unfortunately, the business was very slow.

21   They would always take time at a point when there

22   were no clients, and he would then take a seat and

23   eat some broiled meat, the carmita asara, which

24   was what he liked the most.

25     Q     Is your testimony that there was no

1    structured amount of time for break; is that

2    correct?

3        A    After 5:00 p.m., they could sit down for

4    lunch and take as much time as they wanted.

5        Q    Did he get free meals there?

6        A    That's correct.

7        Q    Was there a limit on what he could have or

8    how much?

9        A    Nothing, zero.

10       Q    Did the company ever keep track of the

11   receipts or anything like that regarding the

12   amount of food he was given?

13       A    That was salary tips?

14       Q    I am talking about the meals that he ate.

15       A    No.

16       Q    Was he ever told that -- was there any

17   type of agreement that meals was part of his

18   wages?

19       A    No.

20       Q    I want to give you what I have marked as

21   Exhibit A.  This is what defendants have given me.

22   Just a few pages.  This is Defendant's Bates

23   stamped 16 and 17.

24            (Plaintiff's Exhibit Number

25        A was marked by the court reporter and is

1        attached to the end of the transcript.)

2        Q    I wanted to know, what is this?  First of

3    all, this is concerning the plaintiff, right?

4    Because I see his name Roberto under server; is

5    that correct?

6        A    Uh-huh.

7        Q    What is this sheet?  What does this

8    represent?

9        A    This sheet represents the times when,

10   unfortunately, all personnel that worked with him,

11   Roberto would tell them, when they are working, to

12   operate with their own codes so they would not

13   have to open again the system.

14        For the work to be easier, for the work to

15   be easier, even I would input, so that all the

16   employees would use his code, and input his code

17   so they wouldn't have to input it every time.

18        Q    Did you ever keep track -- did you have

19   time records or punch cards for the plaintiff's

20   hours and schedule?

21        A    The only record is from the computer,

22   where I realize that he never did the clock-in or

23   the clock-out.  However, Mrs. Maria Arsi always

24   worked from Monday through Friday, 5:00 p.m.  All

25   the time when she opened, she did clock in and did

1    clock out.

2        Q    With respect to this, though, for example,

3    we see -- at the top of Exhibit B, we see

4    12:35 p.m. on August 1st.

5             Is it true that we can't really be sure

6    which of these is the plaintiff because you said

7    other people used his number; is that right?

8        A    That's correct.

9        Q    When I see there for the first one there,

10   take out, that is somebody had to handle a takeout

11   order for one of the customers who picked up the

12   food?

13       A    Yes.

14       Q    When I see the amounts there, like total,

15   like for the first one, 10.9, that means that

16   somebody paid $10.90; is that right?

17       A    Correct.

18       Q    And with respect to the day, were these --

19   let's look at August 2nd there.  Do you see

20   August 2nd, the first entry there for

21   August 2nd?

22       A    Uh-huh.

23       Q    And I look and I go all the way down to

24   the bottom of the page, and I turn the next page.

25   And I go all the way down until I reach the last

1    entry that says $77.94.  Do you see that?

2        A    No, I don't see it.

3        Q    Do you see -- let me ask this.  When you

4    look at these two pages, do you see all the

5    entries for August 2nd?

6        A    If we start on August 2nd, we start at

7    2:00 p.m.

8        Q    On page one on Bates stamp 16, the first

9    page, I see the first entry on August 2nd is

10   2:00 p.m.  Do you see that?

11       A    That's correct.

12       Q    And then the last one I see is at

13   10:39 p.m.; is that right?  On the second page?

14   Or 11:25 p.m., rather.

15       A    Perfect.

16       Q    Are you telling me that for that day,

17   those are all the sales, or are there other sales

18   that other employees were making in addition to

19   these?

20       A    No.  That is what it is.

21       Q    That is the total sales for that day?

22       A    That's correct.

23       Q    Even cash that was received by the

24   company?

25       A    This is not cash.  It says credit cards.

```
 1      Q     If there were cash, would it be reflected

 2   on this sheet?

 3      A     Always.

 4      Q     Is it true that sometimes the plaintiff,

 5   he worked more than 40 hours in one week; is that

 6   correct?

 7      A     I told you at the beginning that in a

 8   year, if he worked that, it would not have been

 9   more than ten times, over 40 hours.

10      Q     On the times that plaintiff did work more

11   than 40 hours, was he paid time and a half

12   overtime?

13      A     No.

14            MR. COSTALES:  Object to form.

15      Q     And why not?

16      A     No.  Because the salary for waiters is

17   calculated salary plus tips.

18      Q     With respect to those tips that you are

19   talking about, did you have a system in place that

20   made sure when the plaintiff's tips were factored

21   in, that he was at least paid minimum wage for

22   every hour worked?

23      A     But to begin with, let's suppose that he

24   only worked 40 hours.  Because if he worked five

25   shifts, it's six, and if he worked an additional
```

41

1    shift, he would come in at 12:00 p.m. to complete

2    his 40 hours.

3        Q    My question is, if you know, was there a

4    specific system in place that kept track of his

5    tips and were monitored to make sure that he was

6    at least paid minimum wage for his hours?  Was

7    there a system or not?

8        A    No.

9        Q    If the plaintiff wasn't using an hourly

10   punch-in system, how did you know how many hours

11   to pay him for?

12       A    Because this system, the first order that

13   he placed, it let's him make the calculation that

14   it was from there on that it started.

15       Q    And you are referring right now to Exhibit

16   B -- or Exhibit A, this printout from the

17   computer, right?

18       A    Correct.

19       Q    But you also told me, just to clarify,

20   that other people used the plaintiff's I.D.

21       A    That's correct.

22       Q    So we can't use this to check his hours,

23   right?

24       A    Well, another one of the reasons is that

25   we are in the business at 10:00 a.m., all the

1   time, waiting for the personnel to come in.

2          MR. KELLY:  I think I am finished.  Do you

3   have anything for him?

4                      EXAMINATION

5   BY MR. COSTALES:

6      Q    Did the plaintiff, Roberto Alvarez, did he

7   work overtime?

8      A    No.

9      Q    Did he work more than 40 hours a week?

10     A    Not always.  He only had six shifts.

11         MR. COSTALES:  Nothing further.

12                     EXAMINATION

13  BY MR. KELLY:

14     Q    Just to clarify, you did say that there

15  were some times when he worked double shifts, but

16  you said it was like ten times a year; is that

17  right?

18     A    But then he was allowed to come in a

19  little later so that he would then complete his 40

20  hours.

21     Q    Let me ask this to be clear.  About how

22  many times a year did he actually work more than

23  40 hours in a week?

24         MR. COSTALES:  Object to form.

25     A    No, never.

1      Q    So you are saying during the relevant

2   period -- let me ask, did he ever work more than

3   40 hours, even one time?

4      A    Not even once.

5           MR. KELLY:  Will she read?

6           MR. COSTALES:  Yes.

7           MR. KELLY:  Thank you.

8           Do you need a break?

9           MR. COSTALES:  Yes, let's take a break.

10          (Ending time:  4:20 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

44

```
 1

 2                    CERTIFICATE OF OATH

 3

 4    STATE OF FLORIDA      )
                            ) SS:
 5    COUNTY OF MIAMI-DADE)

 6

 7           I, ROCHEL ALBERT, Certified Shorthand

 8    Reporter and Notary Public in and for the State of

 9    Florida at Large, certify that the witness,

10    personally appeared before me and was duly sworn.

11

12              WITNESS my hand and official seal this

13    28th day of March, 2016.

14

15          _____

16                    ROCHEL ALBERT, CSR
                      Notary Public, State of
17                    Florida

18

19

20

21

22

23

24

25
```

45

1

2              REPORTER'S DEPOSITION CERTIFICATE

3

4              I, ROCHEL ALBERT, Certified Shorthand

5    Reporter, certify that I was authorized to and did

6    stenographically report the foregoing deposition;

7    that the foregoing transcript of said witness is a

8    true and complete record of my stenographic notes of

9    the deposition by said witness; and that this

10   computer-assisted transcript was prepared under my

11   supervision.

12             I further certify that I am not a

13   relative, employee, attorney or counsel of any of

14   the parties, nor am I a relative or employee of any

15   of the parties, attorney or counsel connected with

16   the action.

17             DATED this 28th day of March, 2016.

18

19

20             _____

21             ROCHEL ALBERT, CSR
               Notary Public, State of Florida
22             at Large.  My commission expires.
               September 4, 2017.  Bonded
23             through Budget Notary Services
               Commission Number FF 049654

24

25

46

```
 1                    CORRECTION SHEET

 2         RE:  ALVAREZ V. LOCURA MARINA
           CASE NO. 15-23129-CIV-DPG
 3         DEPOSITION OF: DEBRA BARRIENTOS
           DATE TAKEN:  January 11, 2016
 4

 5    PAGE/LINE NO:          CORRECTION OR CHANGE

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18

19                    _____

                              WITNESS
20
              Sworn to and subscribed to before me this
21    ___ day of _____, 2016.

22    _____
23    Notary Public in and for the
      State of Florida at Large.
24

25
```

47

```
 1              DEPO EXPRESS REPORTING, INC.
                   1240 N.E. 176 Street
 2            North Miami Beach, Florida 33162
                     (305) 305-3333
 3

 4    March 28th, 2016

 5    To:   DEBRA BARRIENTOS, c/o
            GARY A. COSTALES, Esq.
 6          GARY A. COSTALES, P.A.
            1200 Brickell Avenue, suite 1230
 7          Miami, Florida  33131

 8

 9
              RE:  ALVAREZ V. LOCURA MARINA
10            CASE NO. 15-23129-CIV-DPG
              DEPOSITION OF: DEBRA BARRIENTOS
11            DATE TAKEN:  January 11, 2016

12

13    Dear DEBRA BARRIENTOS,

14    Your transcript from the above-referenced case is
      ready to be read and signed by you.
15
      Please contact my office to make arrangements at
16    your earliest convenience to make an appointment
      to read and sign your original transcript.
17    The original transcript will be forwarded to the
      attorney who ordered it in 15 days or at the time
18    of trial, whichever comes first, with or without
      your signature.
19
      Your prompt attention to this matter is greatly
20    appreciated.

21

22    Sincerely,

23
      Rochel Albert, Court Reporter
24    Depo Express Reporting

25
```